**IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION**

EDWARD SPENCER, YANIRA
ALGARIN, STEVEN NUZZO, and
MARGIE TYSON,

      Plaintiff,                                     Civil Action No:

v.

SONNY PERDUE, in his official
capacity as the Secretary of the United
States Department of Agriculture;
BRUCE LAMMERS, in his official
capacity as the Administrator of Rural
Housing Service; PHILIP LEARY, in his
official capacity as the Rural
Development State Director for the
State of Florida; and SLATE WEST
ELEVEN LLC, as owner of Slate
Luxury Apartments,

      Defendants.
_____/

**COMPLAINT FOR DECLARATORY JUDGMENT,
<u>INJUNCTIVE RELIEF, AND COMPENSATORY DAMAGE</u>S**

**PRELIMINARY STATEMENT**

1.   Plaintiffs are low-income individuals who live in Slate Luxury Apartment, a

      109-unit former USDA Rural Development (RD) Section 515 apartment

complex that was constructed, subsidized and operated as Osprey Landing

Apartments until April 30, 2018, when the original owner received RD's illegal

approval to prepay the loan, purportedly in accordance with the Emergency Low

Income Housing Preservation Act of 1987 (ELIHPA), thereby terminating all RD

subsidies and lifting all the RD affordability restrictions. Thereafter, the original

owner sold the complex to its current owner, Slate West Eleven LLC.

2. Upon prepayment, the rent at the development was increased to local market

rent and the Plaintiffs each received a RD voucher, which range in value from

$301 to $350. The RD voucher paid part of the difference between their rent

prior to prepayment and the market rent for their home, thereby allowing them

to stay in their homes for one year following the prepayment.

3. Now, at the end of the 12-month lease term, Slate West Eleven LLC is either

increasing rents by as much as $390 per month or not renewing the leases

without good cause. Plaintiffs now face imminent and certain displacement from

their homes due to either non-renewals or unaffordable rent increases,

something that would not have happened had RD, consistent with ELIHPA,

refused to allow the owner the right to prepay the loan without use restrictions.

4. Plaintiffs bring this lawsuit to enjoin the rent increase and to require RD to place

use restrictions against the property that should have been placed against the

property at the time of prepayment and would have protected Plaintiffs from the

annual threat of losing their homes, which are near friends and critical services

upon which they rely, and where many senior residents, including Plaintiff

Margie Tyson, had planned to spend the rest of their lives.

## JURISDICTION

5.  Plaintiffs' claims against the federal defendants arise under the Administrative

    Procedure Act (APA), the U.S. Constitution, and other federal laws.

6.  This Court has jurisdiction over these claims pursuant to 28 U.S.C. §§ 1331,

    1337, 1343(a)(4) and 1361.

7.  Declaratory relief is authorized by 28 U.S.C. §§ 2201 and 2202.

8.  Plaintiffs' claims for injunctive relief are authorized under Rule 65 of the

    Federal Rules of Civil Procedure.

9.  This Court has supplemental jurisdiction over Plaintiffs' state law claims

    against the Private Defendant, Slate West Eleven LLC, under 28 U.S.C. §

    1367(a) because they arise out of the same set of facts as Plaintiffs' federal

    claims.

## VENUE

10. Venue is proper in the Middle District of Florida pursuant to 28 U.S.C. §1391(b)

    and in the Orlando Division pursuant to M.D. Loc. Rule 1.02(b) because the

    Plaintiffs reside here, a substantial part of the events, acts, or omissions giving

rise to the Plaintiffs' claims occurred here, the property at issue is located in this district and Defendants conduct business here.

## PARTIES

11. Plaintiff Edward Spencer is a low-income current tenant at Slate Luxury Apartments, formerly known as Osprey Landing Apartments and operated under the Section 515 RD Rural Rental Housing Program. Under his previous lease, he paid approximately $424 for rent. He is facing a $285 rent increase brought about by the illegal prepayment of the RD Section 515 loan.

12. Plaintiff Steven Nuzzo is a low-income senior citizen who is a current tenant at Slate Luxury Apartments, formerly known as Osprey Landing Apartments and operated under the Section 515 RD Rural Rental Housing Program. Under his previous lease, he paid approximately $500 for rent. He is facing a $390 rent increase brought about by the illegal prepayment of the RD Section 515 loan.

13. Plaintiff Margie Tyson is a low-income senior citizen who is a current tenant at Slate Luxury Apartments, formerly known as Osprey Landing Apartments and operated under the Section 515 RD Rural Rental Housing Program. Under her previous lease, she paid $473 for rent and had a $119 utility allowance. She is facing a $324 rent increase, brought about by the illegal prepayment of the RD Section 515 loan that will displace her from her home.

14. Plaintiff Yanira Algarin is a low-income current tenant at Slate Luxury Apartments, formerly known as Osprey Landing Apartments and operated under the Section 515 RD Rural Rental Housing Program. Under her previous lease, she paid $485 for rent. She and her minor child are facing the non-renewal of her lease and permanent displacement from their current home as a result of the illegal prepayment of the RD Section 515 loan.

15. Defendant Sonny Perdue, the Secretary of the United States Department of Agriculture (USDA) is statutorily vested with the authority to operate the rural housing programs, including the Section 515 program, authorized by Title V of the Housing Act of 1949, 42 U.S.C. §§ 1471, et seq. Defendant Perdue is sued in his official capacity.

16. Defendant Bruce Lammers is the Administrator of the Rural Housing Service (RHS) who is responsible for the day-to-day administration of all the RD rural housing programs on the national level. Defendant Lammers is sued in his official capacity.

17. Defendant Philip Leary is the RD Florida State Director. He is responsible for the day-to-day administration of the RD housing programs in Florida. An RD employee, under Mr. Leary's direction and control, oversees the operation of RD multi-family housing programs in Florida and is responsible for processing pre-payment requests submitted from Florida owners of RD-financed Section 515 developments. Defendant Leary is sued in his official capacity.

18. Defendant Slate West Eleven LLC, a Delaware Limited Liability Corporation, is the current owner and operator of Slate Luxury Apartments, formerly operated as Osprey Landing I and II. Prior to November 13, 2018, Slate West Eleven LLC operated as Deancurt Winter Garden LLC, a Delaware Limited Liability Corporation. When dealing with the residents of Slate Luxury Apartments, Slate West Eleven LLC and Deancurt Winter Garden LLC have used the name Slate Luxury Apartments. All three names are used interchangeably herein when referring to Slate West Eleven LLC.

## FACTS

I.  **Osprey Landing Apartments: Section 515 Rural Development Projects**

   A.  **Section 515 Financing**

19. The USDA, through its RD mission area and the RHS, finances and subsidizes the development and operation of rental housing in rural areas throughout the United States under Section 515 of the Housing Act of 1949. 42 U.S.C. § 1485.

20. The Section 515 program authorizes RD to make loans to private, public, and nonprofit developers to construct and operate subsidized housing for very low-, low-, and moderate-income households in rural areas.

21. Housing developments financed through the Section 515 program are subject to certain affordability requirements and rent restrictions that remain in effect throughout the term of the loan.

22. Osprey Landing Apartments was originally developed as a RD Section 515 housing complex located in the heart of downtown Winter Garden, Florida.

23. Osprey Landing Apartments were legally two separate RD financed developments.

24. Osprey I was a 71-unit family complex that was built and financed with a 50-year $1,495,480 Rural Development loan made in 1979 to Winter Garden Villas of Orange County Ltd. That loan was scheduled to mature in 2029.

25. RD made a second 515 loan in the amount of $845,000 for Osprey I in 1994. That loan, which was made for the purpose of maintaining and rehabilitating Osprey I, was scheduled to mature in 2044.

26. Osprey II was a 38-unit elderly complex that was financed and constructed with a 50-year, $884,330 RD Section 515 loan made in 1980 to Winter Garden Villas II Ltd. That loan was scheduled to mature in 2030.

27. Osprey I and II were managed jointly when they were operating under the Section 515 program.

**B. Rental Subsidies**

28. Residents of Section 515 developments may be beneficiaries of Interest Credit and Rental Assistance subsidies from RD. These subsidies, both authorized by 42 U.S.C. § 1490a, enable low- and very low-income people to afford the rents in Section 515 developments.

29. The Interest Credit subsidy program, which reduces the interest rate on a Section 515 loan to a 1% effective interest rate, is available for all Section 515 developments and units. 42 U.S.C. § 1490a(a)(1)(B).

30. Under the Interest Credit program, the owner, with RD's approval, establishes a basic rent for each unit in the development, which is based on the cost of operating the development and amortizing the RD loan at the 1% interest rate. Residents pay the higher of 30% of their income or the basic rent, which is usually less than market rent in the area. 7 C.F.R. §§ 3560.11 & 3560.203(a).

31. Rental Assistance (RA) is a deep subsidy program authorized by 42 U.S.C. § 1490a(2)(A) which is available to very low- and low-income residents of Section 515 housing. Beneficiaries of the program pay 30% of household income for shelter, which includes the cost of rent and utilities.

32. RA is extended to residents through a contract between the owner and RD for a certain number of housing units in a development. These contracts may provide RA to some or all of the resident households in a development.

33. Thirty-eight of the units in Osprey I and 9 of the units in Osprey II received RA. Plaintiff Nuzzo received RA through early 2018. Plaintiffs Algarin, Spencer and Tyson were not RA recipients.

34. Residents' shelter costs in Section 515 developments include the cost of rent and utilities.

35. In developments that have master-metered utilities, the unit rent charged to the residents includes the cost of utilities.

36. In developments, such as Osprey I and II, which are not master-metered, residents are required to pay part or all of their utility costs directly to the local utility.

37. The owner, with RD's review and approval, establishes a utility allowance based on a survey of resident paid utilities for each unit size.

38. In developments with a utility allowance, the rent payment paid by the resident to the owner is reduced by the utility allowance.

39. When a resident's rent payment to the owner is less than the utility allowance, the owner pays the resident, on a monthly basis, part or all of the utility allowance.

### C. The Emergency Low Income Housing Preservation Act Of 1987 (ELIHPA)

40. From 1963, when the Section 515 program was enacted, until December 21, 1979, owners who secured Section 515 loans were not obligated to operate the RD financed housing as affordable housing for any period of time. They had the right to prepay their loans and thereafter operate the housing as they chose.

41. In 1979, Congress adopted legislation that required all owners who obtained Section 515 loans after December 21, 1979, to maintain the affordability of the developments for a term of 20 years.

42. Subsequently, in 1989, Congress adopted legislation that required owners who secured 515 loans after December 15, 1989, to maintain housing financed by Section 515 as affordable housing for the term of the RD loan.

43. Congress' action did not limit the right of pre-1979 owners from prepaying their loans. Nor did it preclude owners who secured Section 515 loans between December 21, 1979 and December 15, 1989, from prepaying their loans once the 20-year use restriction expired. *See* 42 U.S.C. § 1472(c)(1)(A).

44. Owners of Section 515 developments whose loans were entered into prior to December 15, 1989, frequently seek to prepay their RD loans before loan maturity in order to increase their return on investment, or realize the increased value of their investment, by either converting the Section 515 financed development to market rate rental housing or selling the development to others who would undertake such a conversion.

45. Concerned about prepayments and the displacement of low income residents, Congress enacted the Emergency Low Income Housing Preservation Act of 1987 (ELIHPA), P.L. 100-232 (Feb 5, 1988). Among other goals related to housing financed by the Department of Housing and Urban Development, ELIHPA was enacted for the express purpose of preserving 150,000 Section 515 units and to limit the displacement of its residents from their homes. Pub. L. No. 100-242, § 202 (b), 101 Stat. 1877, 1878 (1988). ELIHPA, as modified by a 1992 amendment, is codified at 42 U.S.C. § 1472 (c).

46. Any loan payment that retires an RD loan prior to its original maturity date is a prepayment, which is subject to the ELIHPA prepayment restrictions codified at 42 U.S.C. §1472(c) and RD regulations codified at 7 C.F.R. Part 3560, Subpart N. 7 C.F.R. §3560.11 (definition of prepayment).

47. ELIHPA limits the prepayments of Section 515 loans and protects the residents of that housing from rent increases and displacement by restricting the prepayment rights of owners who entered Section 515 loans before December 21, 1989. 42 U.S.C. § 1472(c).

48. ELIHPA achieves its goals by requiring owners to apply to RD for permission to prepay their loans, *see* 42 U.S.C. § 1472(c)(3); obligating the agency to offer one or more incentives to owners to encourage them to remain in the 515 program for an additional 20 years, *id.* § 1472(c)(4); and requiring owners who reject the incentives to offer the development for sale to a nonprofit or public agency. *Id.* § 1472(c)(5)(A).

49. ELIHPA allows owners to prepay their Section 515 loans if the prepayment will not have a material impact on minority housing opportunities and there is adequate, alternative, affordable housing in the community to which the residents can move on or about the time of the prepayment. *Id.* § 1472(c)(5)(G)(ii). If RD determines that the prepayment has a material impact on minority housing opportunities, ELIHPA requires the owner to offer the

development for sale to a nonprofit or public agency that would continue to operate the development as affordable housing. *Id.* § 1472(c)(5)(A).

50. If the prepayment does not have a material impact on minority housing opportunities but there is not sufficient alternative affordable housing in the community, the owner may only prepay the loan if the owner agrees to have use restrictions placed against the property that require the owner to continue to rent the development to residents living in the development as of the date of prepayment at such rental rates and terms that would not displace the residents for as long as they choose to remain in their homes. *Id.* 42 U.S.C. § 1472(c)(5)(G)(ii)(I).

### D. Osprey Landing's Prepayment Request And Approval

51. In 2015, Thomas James Mannausa was the sole general partner of both Winter Gardens Villas of Orange County Ltd. and Winter Gardens Villas II Ltd., the owners of Osprey Landing I and II, respectively.

52. In 2015, Winter Garden Villas and Winter Gardens Villas II applied to RD to prepay the Section 515 loans for Osprey I and II.

53. On November 1, 2017, Tim G. Rogers, the RD Florida Multi-family Housing Programs Director, sent a letter to Mr. Mannausa informing him that the Osprey I loan could be prepaid without any restrictions because (1) "[c]urrent program authorities do not allow any incentive offers to be made that require rental

assistance or equity loans" and (2) the "property is needed, however, it is too costly for the Agency to maintain in the program as affordable housing." Exhibit 1, Letter from Rogers to Mannausa 11/1/17.

54. A nearly identical letter was sent by RD to Mr. Mannausa with respect to Osprey II. Exhibit 2, Letter from Rogers to Mannausa 11/1/17.

55. Mr. Rogers' November 1, 2017, letters acknowledge that the owners of Osprey I and II were willing to accept equity loans from RD, to use the loan funds to take care of Osprey I and II deferred maintenance needs and to rehabilitate the properties to meet accessibility standards. It also set the loan prepayment date as April 30, 2018.

56. On November 1, 2017, Mr. Rogers, executed two copies of Form RD 2006-38, Rural Development Environmental Justice (EJ) and Civil Rights Impact Report (CRIA) Certification, for Osprey I and II.

57. Attached to the reports were two maps. The first map includes a notation that "[t]he proposed commuting area includes the counties of Orange, Seminole, Lake, Polk, Osceola, and Brevard. USDA Rural Development financed units equal 1907 units with 135 vacant. In addition, FactFinder, lists a total of over 2400 units vacant in the area."

58. The second map shows six regions in Florida with the number of properties and units in each region. The map does not state the types of properties identified in

each of the regions. None of the regions shown on the map have 1907 units and no vacancies are listed for the any of the regions.

59. On March 1, 2018, RD sent a letter to all residents of Osprey Landing I and II advising them that it has approved the prepayment of Osprey Landing I and II. Exhibit 3, Letter from Rogers to Tenants of Winter Garden Villas of Orange Co., Ltd. 3/1/18; Exhibit 4, Letter from Rogers to Tenants of Winter Garden Villas II of Orange Co., Ltd. 3/1/18. That letter states that the prepayment had been approved because "[t]here are many apartments similar to yours in quality, size, location and rents in the Winter Gardens and surrounding communities." *Id*.

60. RD and the owner of Osprey Landing I and II scheduled resident meetings for March 19, 2018. On information and belief two resident meetings were held that day.

61. RD staff as well as a representative of Slate Luxury Apartments were at the March 2018 meeting attended by Plaintiffs and other residents of Osprey I and II.

62. At the March 2018 resident meeting, tenant options, such as receipt of vouchers and relocation to other RD developments, were discussed. Residents were advised that the new owners would honor the existing leases after the prepayment until they expired.

63. The Slate Luxury Apartments' representative informed the residents that it will accept RD vouchers and continue to house residents receiving RD vouchers. She

also informed residents that they would have up to 10 months to sign up for an RD voucher but that the real deadline for signing up was by the time the lease expired. Otherwise, residents would be responsible for the new rent amount under the new lease.

64. She cautioned residents that there was no benefit to waiting to sign up for the RD vouchers and advised them to sign up as soon as they received the RD voucher paperwork.

65. RD has an obligation to advise residents of a prepaying development with information about their right to continue to live under their existing lease after a prepayment, their right to relocate to other RD apartments through the use of a Letter of Priority Entitlement, their right—if they were recipients of Rental Assistance—to move that Rental Assistance subsidy to other RD housing, and their rights to remain in their homes or move to other private housing with a RD voucher.

66. The information provided by RD to the residents of Osprey I and II was not in conformance with ELIHPA, RD regulations, RD handbooks or the RD Voucher Program Guide.

67. The information provided by RD staff that did not conform to ELIHPA included, but was not limited to:

    a.   An assertion that when an owner prepays the RD loan, the rent of residents of the prepaid development would increase immediately due to

the termination of the Rental Assistance, an assertion that did not

indicate that there was any limit on how much rent might increase.

b.  Failure to inform tenants that they have a right to continue to live in their

homes under their current lease and continue to pay only their current

tenant contribution.

c.  Erroneously informing the tenants that, in order to maintain affordable

rents, they must secure RD vouchers and that vouchers can only be issued

upon their execution of a new lease with Deancurt Winter Garden.

68. Defendant Deancurt Winter Garden required Plaintiffs to enter into new leases

that began July 1, 2018, regardless of when their existing leases expired.

69. At the time that Deancurt Winter Garden presented its new lease to Ms. Algarin,

she had a valid lease in effect that was not scheduled to expire until January 31,

2019. That lease generally conformed to RD lease requirements: it was a

one-year lease that automatically renewed for another one-year term at the end

of each term, it could only be terminated for good cause, and provided Ms.

Algarin the right to appeal any owner adverse decision except the right to evict

the household.

70. At the time that Deancurt Winter Garden presented its new lease to Mr. Spencer,

he had a valid lease in effect that was not scheduled to expire until October 31,

2018. That lease generally conformed to RD lease requirements: it was a

one-year lease that automatically renewed for another one-year term at the end

of each term, it could only be terminated for good cause, and provided Mr. Spencer the right to appeal any owner adverse decision except the right to evict the household.

71. On April 9, 2018, Mr. Spencer was presented with a new lease that he was required to execute. That lease became effective July 1, 2018, and is set to expire June 30, 2019.

72. The new lease, among other provisions, increased Mr. Spencer's rent and eliminated his utility allowance. This increased his rent payments from approximately $424 to $455. In addition, he had to continue to pay his full utility costs.

73. At the time that Defendant Deancurt Winter Garden presented its new lease to Ms. Tyson, she had a valid lease in effect that was not scheduled to expire until October 31, 2018. That lease generally conformed to RD lease requirements: it was a one-year lease that automatically renewed for another one-year term at the end of each term, it could only be terminated for good cause, and provided Ms. Tyson the right to appeal any owner adverse decision except the right to evict the household.

74. On July 11, 2018, Ms. Tyson was presented with a new lease that she was required to execute. That lease became effective July 1, 2018, and is set to expire June 30, 2019.

75. The new lease, among other provisions, increased Ms. Tyson's rent and eliminated her $119 utility allowance. This increased her rent payments from $473 to $505. In addition, she had to continue to pay her full utility costs.

76. The new leases eliminated Plaintiffs' right to comment on proposed rent and utility cost increases, the right to have the lease renewed annually, and their right to appeal adverse decisions under the RD grievance and appeals process. It also significantly increased late fees.

**II.    Osprey Landing Becomes Slate Luxury Apartments**

77. On or about April 12, 2018, RD executed two satisfactions of liens releasing its mortgages against Osprey I and II. The lien releases were recorded on May 3, 2018, without any use or other restrictions.

78. On or about April 30, 2018, Winter Garden Villas of Orange County, Ltd., and Winter Garden Villas II of Orange County Ltd., granted a warranty deed for both properties to Deancurt Winter Garden LLC, a Delaware limited liability company. That warranty deed was recorded on May 1, 2018.

79. On April 30, 2018, Deancurt Winter Garden LLC, assigned its collateral in leases and rents in the Osprey Landing Apartments (formerly Osprey I and II), to TD Bank in order to secure a $715,000 loan from the bank.

80. Effective May 1, 2018, Rental Assistance and Interest Credit subsidies for the residents of Osprey I and Osprey II were terminated because of the prepayment of the RD loans for the properties.

81. Deancurt Winter Garden LLC renamed Osprey I and II to Slate Luxury Apartments after it became the owner of the developments.

82. Deancurt Winter Garden LLC began a renovation of Slate Luxury Apartments shortly after it assumed ownership of the development.

83. In order to carry out the renovation, Deancurt Winter Garden refused to renew the leases of several residents of the development forcing the residents to move to other housing.

84. In April 2019, Slate West Eleven LLC, advised Mr. Nuzzo that his lease would expire on June 30, 2019, that he needed to sign a new lease if he intended to stay at Slate Luxury Apartments and that his rent payment would increase to $1,300 per month.

85. Mr. Nuzzo signed a new lease as he could not locate any alternative housing that was affordable and available in the area.

86. As a result of Slate West Eleven LLC's actions, Mr. Nuzzo has faced increased anxiety and depression.

87. Beginning April 9, 2019, Slate West Eleven LLC, advised Mr. Spencer that his lease would expire on June 30, 2019, that he needed to sign a new lease if he intended to stay at Slate Luxury Apartments and that his rent payment would increase to $1,090 per month.

88. Mr. Spencer signed a new lease, in part, because he could not locate any alternative housing that was affordable and available in the area.

89. Beginning April 15, 2019, Slate West Eleven LLC, advised Ms. Tyson that her lease would expire on June 30, 2019, that she needed to sign a new lease if she intended to stay at Slate Luxury Apartments and that her rent payment would increase to $1,130 per month.

90. As a result of Slate West Eleven LLC's actions, Ms. Tyson has been worried and stressed about her housing, and has had difficulty sleeping.

91. On April 8, 2019, Slate West Eleven LLC issued Ms. Algarin a Notice of Non-Renewal for her unit.


## CLAIMS

### COUNT I
**RD's Decision to Approve the Prepayments of Osprey I and II
Violated ELIHPA and Was Otherwise Arbitrary and Capricious
Violation of the Administrative Procedure Act, 5 U.S.C. § 706
Against Federal Defendants by All Plaintiffs**

92. Plaintiffs incorporate by reference paragraphs 1-68, and 77-80 of this Complaint as though fully set forth herein.

93. ELIHPA requires RD to offer incentives to owners who seek to prepay their loans in an effort to keep the development in the Section 515 program for a term of 20 or more years. 42 U.S.C. § 1472(c)(4).

94. Two incentives that are frequently offered to prepaying owners are equity loans, which can equal up to 90% of the owner's equity in the property and an increase

in the number of units in the development that receive Rental Assistance. *Id.* § 1472(c)(4)(B).

95. Prior to November 1, 2017, RD had determined that Osprey I and II were eligible to receive an equity loan of $2,873,849 and Osprey II was eligible to receive an equity loan of $1,819,224.

96. On information and belief, Mr. Mannausa advised RD that he was willing to accept an equity loan in exchange for his agreeing to continue to operate Osprey I and II as an affordable development for an additional 20 years and that he was prepared to use part or all of the equity funds to undertake any necessary deferred maintenance and to rehabilitate the development to make it comply with federal accessibility standards.

97. RD responded to Mr. Mannausa's offer by analyzing whether the repairs and rehabilitation proposed would meet the RD cost effectiveness standards.

98. RD concluded that the cost of the repairs and rehabilitation would be within RD's cost effectiveness standards, but that RD did not have RA funding to provide Osprey I and II with the additional RA units needed to maintain the affordability of the residents' rents.

99. On information and belief, RD had RA funding available in 2017 and 2018 to extend additional RA units to Osprey I and II.

100. Even if RD did not have funding to extend additional RA to Osprey I and II, it could have offered to place the Osprey request for RA on a waiting list to receive such funds when they became available.

101. On information and belief, RD had Section 515 funding available in 2017 and 2018 to make equity loans for Osprey I and II.

102. On information and belief, RD did not consider or suggest to Mr. Mannausa that he secure a third-party equity loan or advise him that RD could subordinate its lien position to that of the lender to encourage a third party to make such a loan.

103. RD's decision to not make an equity loan, to not suggest a third party equity loan, or to not provide additional RA units to Osprey I and II violated ELIHPA, RD regulations and handbook. RD's actions thus violated 5 U.S.C. § 706.

104. ELIHPA authorizes RD to approve a prepayment request without subjecting the prepayment to use restrictions only when it finds that there is adequate, alternative, affordable housing available in the community to which the remaining residents can relocate as of the date of prepayment. 42 U.S.C. § 1472(c)(5)(G)(ii).

105. On November 1, 2017, RD advised Mr. Mannausa that it was approving the prepayment of Osprey I and II without use restrictions because RD's "1. Current program authorities do not allow any incentive offers to be made that require rental assistance or equity loans [and] 2. The property is needed, however, it is

too costly for the Agency to maintain in the program as affordable housing."
Exhs. 1 & 2.

106. RD's approval of the Osprey I and II prepayments violated ELIHPA because neither of the reasons given by RD for approving the prepayment are grounds upon which RD may approve a prepayment without use restrictions.

107. On March 1, 2018, RD advised the residents of Osprey I and II that prepayment of the RD loans have been approved because "there are many apartments similar to yours in quality, size, location, and rent in the Winter Garden and surrounding communities." Exhs. 3 & 4.

108. The fact that RD advised the owners and the residents of different grounds upon which RD approved the prepayment of Osprey I and II is arbitrary and capricious and in violation of the APA, 5 U.S.C. § 706.

109. The information supporting the reason that RD gave to the residents for approving the Osprey I and II prepayment, as set out in the CRIAs for Osprey I and II, was arbitrary and capricious for the following reasons:

    a.   RD has very limited guidance for determining what geographic area should be used to determine the availability of alternative affordable housing in the community and the Florida RD did not state any reasons for selecting the six counties surrounding Orange County as the appropriate community;

b.  The CRIAs did not consider whether communities that were used to determine the availability of other housing, including RD housing, were within reasonable distance of the Osprey I and II residents' jobs, families or other services that the residents, particularly elderly residents such as Ms. Tyson or residents with disabilities such as Mr. Nuzzo, relied on;

c.  The CRIA made no effort to analyze why the 135 RD units that it identified were vacant;

d.  The CRIA made no effort to determine whether the RD developments within the selected area, particularly those with vacancies, had waiting lists and how long it would take to move off of the waiting lists into a vacant unit;

e.  The CRIA made no effort to determine whether the developments with vacancies had sufficient number of RA units available to accommodate the 47 RA assisted residents of Osprey I and II.

f.  The data collected about RD vacancies in the selected area was collected before November 17, 2017. No effort was made to determine whether the purportedly vacant units would be available for occupancy in March of 2018 when RD advised the residents of its approval of the Osprey I and II prepayment, or, on April 30, 2018 when the prepayments were expected to occur.

g.   The CRIAs reliance on general census vacancy data did no attempt to determine whether the data was current, and whether the vacant units: were affordable to all the residents of Osprey I and II, met health and safety standards, and of the size that the Osprey I and II residents needed.

110.  The CRIA is also arbitrary and capricious because it gave no consideration to readily available information from the Florida 2016 Rental Market Study, which concluded that Central Florida was experiencing a housing crisis and included an assessment of the number of affordable, available rental units by county and income levels. The study concluded that between 2010 to 2014, the Orlando-Kissimmee Metropolitan Statistical Area, which includes Lake, Orange, Osceola, Seminole, and Sumter counties, had more renter households than available, affordable units at the 0-30 percent AMI levels (23 affordable, available rental units per 100 renters), 0-40 percent AMI levels (38 affordable, available rental units per 100 renters), at the 0-50 (64 affordable, available rental units per 100 renters), and 0-60 percent AMI levels (95 affordable, available rental units per 100 renters).

111.  RD's analysis of available affordable housing did not conform to its own finding that the Osprey I and II housing was needed.

112.  RD's conclusion that there was ample alternative, adequate and affordable housing to which the residents of Osprey I and II could relocate as of the date of prepayment was incorrect.

113.  RD's conclusion that there was ample alternative adequate and affordable housing to which the residents of Osprey I and II could relocate as of the date of prepayment was arbitrary and capricious and violated 5 U.S.C. § 706.

114.  RD's approval of the prepayment of Osprey Landing I and II without use restrictions that protect the residents of the development from rent increases and displacement for as long as they choose to remain in their homes violated ELIHPA, was arbitrary and capricious and violated 5 U.S.C. § 706.

**COUNT II**
**Violation of Residents' Due Process Rights**
**Violation of the Administrative Procedure Act, 5 U.S.C. § 706**
**Against Federal Defendants by All Plaintiffs**

115.  Plaintiffs incorporate by reference paragraphs 1-68, and 77-80 of this Complaint as though fully set forth herein.

116.  When an owner of a Section 515 development prepays a loan, RD subsidies terminate as does RD's regular supervision and monitoring of most of the owner's actions including approval of all rent increases, the maintenance of the development, the content of leases, the term of leases, and the basis upon which a lease may be terminated.

117.  RD's decision to approve the prepayment of Osprey I and II is a decision that terminated various forms of assistance to the residents of Osprey I and II.

118.  42 U.S.C. § 1480(g), 7 U.S.C. § 6991, and USDA regulations published at 7 C.F.R. Part 11 A require RD to give persons, including tenants, whose assistance is denied, reduced or terminated, written notice of the reasons for the denial, reduction or termination of assistance and must provide them the right to appeal the adverse decisions made by agency staff to the U.S.D.A. National Appeals Division (NAD).

119.  Plaintiffs are entitled to notice and and an opportunity to appeal the RD prepayment decision under the Due Process Clause of the Fifth Amendment to the U.S. Constitution.

120.  RD did not give Plaintiffs a notice advising them of their right to appeal the prepayment approval decision to the NAD.

121.  Federal Defendants' failure to advise Plaintiffs of the reasons RD approved the Osprey I and II prepayments and their failure to extend to them the right to appeal that decision to a NAD hearing officer violated Plaintiffs' constitutional, statutory, and regulatory due process rights.

122.  Federal Defendants' actions are contrary to law and in violation of 5 U.S.C. § 706.

**COUNT III**
**Violation of Residents' Right to Remain in Their Home**
**Violation of the Administrative Procedure Act, 5 U.S.C. § 706**
**Against Federal Defendants by All Plaintiffs**

123. Plaintiffs incorporate by reference paragraphs 1-91 and 93-114 of this Complaint as though fully set forth herein.

124. RD residents who remain in their homes after a prepayment that is made subject to use restriction have a right to remain in their home for as long as they choose to do so. 42 U.S.C. § 1472(c)(5)(G)(ii)(I), 7 C.F.R. § 3560.662(b)(2).

125. RD regulations require owners who have prepaid developments subject to the restrictions to continue to operate units occupied by remaining residents in accordance with 42 U.S.C. § 1485 and RD regulations published at 7 C.F.R. Part 3560.

126. Under the RD Voucher program, residents who remain in use restricted units have a right to receive an RD Voucher. 82 Fed. Reg. 21972 (May 11, 2017). The receipt of voucher assistance does not affect the right of the resident to stay in her home.

127. When residents who remain in prepaid RD developments choose to receive RD Voucher Assistance, RD requires the owner to enter into a Housing Assistance Payment (HAP) contract which obligates the owner to certify that the owner and the RD voucher recipient have entered into a standard lease that is used by the

owner, or other private owners in the community, when leasing apartments to private unsubsidized tenants.

128. The HAP contract also requires the owner and resident to execute a lease addendum that allows the owner to terminate the lease at the end of any term for any business reason including the desire to rent the unit to renters willing to pay higher rents.

129. These provisions of the RD prescribed HAP contract and lease addendum violate 5 U.S.C. § 706 because they are contrary to law.


**COUNT IV**
**Unlawful Abrogation of Residents' Section 515 Leases**
**Violation of Florida Consumer Collection Practices Act § 559.72(9), Fla. Stat.**
**Against Defendant Slate West Eleven LLC by Plaintiffs Algarin, Spencer & Tyson**

130. Plaintiffs incorporate by reference paragraphs 1-39 and 51-91 of this Complaint as though fully set forth herein.

131. Defendant Slate West Eleven LLC is a person under § 559.72(9), Fla. Stat.

132. Plaintiffs each signed a new lease with Slate Luxury Apartments in July 2018 because they were told that they must sign a new lease to get a rural development voucher.

133. However, the March 1, 2018, letter that Plaintiffs received provided that the rent for their current apartments would remain the same until their leases expired.

134. It also provided that if they remained in their apartment after the rent went up, Deancurt Winter Garden could not evict them without good cause regardless of who was paying the rent.

135. The lease beginning July 1, 2018, that Deancurt Winter Garden required Plaintiffs to execute was in all aspects inferior to their leases in effect prior to the prepayment.

136. Plaintiffs Algarin, Spencer and Tyson did not receive any consideration from Defendants for executing new leases prior to the termination of their existing leases that were in effect at the time of prepayment.

137. From July 1, 2018, to October 31, 2018, Deancurt Winter Garden required Plaintiffs Tyson and Spencer to pay rent in excess of what was required by their leases that ended on October 31, 2018.

138. From July 1, 2018, to January 31, 2019, Deancurt Winter Garden required Plaintiff Algarin to pay rent in excess of what was required by her lease that ended on January 31, 2019.

139. Defendant Slate West Eleven LLC violated the Florida Consumer Collection Practices Act when it required Plaintiffs Algarin, Spencer and Tyson to sign leases that abrogated their existing leases, lacked consideration, increased their rent and utility charges, and subjected them to future rent increases in advance of any eligible rent increases.

**COUNT V**
**Violation of the Obligation of Good Faith And Fair Dealing, § 83.44, Fla. Stat.**
**Against Defendant Slate West Eleven LLC by All Plaintiffs**

140.  Plaintiffs incorporate by reference paragraphs 1-39 and 51-91 of this Complaint as though fully set forth herein.

141.  Plaintiffs signed new leases with Deancurt Winter Garden in July 2018 because they were told that they must sign a new lease to get a Rural Development voucher.

142.  However, the March 1, 2018, letter that Plaintiffs received from RD provided that the rent for their current apartment would remain the same until their leases expired or the prepayment closed, whichever occurred later.

143.  From July 1, 2018, to October 31, 2018, Deancurt Winter Garden required Plaintiffs Tyson and Spencer to pay rent in excess of what was required by their leases that ended on October 31, 2018.

144.  From July 1, 2018, to January 31, 2019, Deancurt Winter Garden required Plaintiff Algarin to pay rent in excess of what was required by her lease that ended on January 31, 2019.

145.  The March 1, 2018, letter from RD also provided that if the tenants remained in their apartment after the rent went up, Slate Luxury Apartments could not evict them without good cause regardless of who was paying the rent.

146. Defendant Slate West Eleven LLC issued Ms. Algarin a notice of non-renewal for purportedly breaching cleanliness standards, having unauthorized occupants, breaching the parking policy and disturbing other tenants and staff.

147. These purported basis for non-renewal are non-material lease violations and do not constitute good cause for evicting Ms. Algarin from the unit under Florida law.

148. Defendant Slate West Eleven LLC has offered to renew Plaintiffs Nuzzo, Spencer and Tyson's leases at increased rental rates, even though little to no improvements have been made to their individual units.

149. In addition, the community laundry room has been closed and other promised amenities, including a resort style pool and fitness center, have not yet been completed.

150. Defendant Slate West Eleven LLC violated its obligation of good faith and fair dealing with Plaintiffs Algarin, Spencer and Tyson when it required them to sign leases that abrogated their existing leases, lacked consideration, increased their rent and utility charges, and subjected them to future rent increases in advance of any eligible rent increases.

151. Defendant Slate West Eleven LLC violated its obligation of good faith and fair dealing by only offering to renew Plaintiffs Nuzzo, Spencer and Tyson's leases at higher rental rates than they are currently paying.

152. Defendant Slate West Eleven LLC violated its obligation of good faith and fair dealing by not renewing Plaintiff Algarin's lease without good cause.

153. As a result of the non-renewal, Ms. Algarin faces the threat of permanent displacement from her home.

## **PRAYER FOR RELIEF**

Plaintiff requests the following relief:

A. A permanent injunction prohibiting Slate West Eleven LLC from charging Plaintiffs more for rent and utilities than they would be required to pay under RD regulations codified at 7 C.F.R. Part 3560 and adjusting those when authorized by 42 U.S.C. § 1472(c)(5)(G)(ii)(I) and 7 C.F.R. § 3560.663(c)(1).

B. Order Slate West Eleven LLC to adopt use restrictions comparable to the restrictions that RD would have placed on Osprey I and II had its prepayment been approved by RD subject to use restrictions:

   a. That any increases in rent or utility rates does not exceed amounts authorized by 42 U.S.C. § 1472(c)(5)(G)(ii)(I);

   b. That require the continued acceptance and renewal of Plaintiffs' RD voucher;

   c. That prohibit the eviction of Plaintiffs from the unit without good cause.

    d. That entitle Plaintiffs to seek review of any adverse decisions made by Slate West Eleven LLC in accordance with the Lease and Grievance Process.

C. Declare that RD has violated Plaintiffs' due process rights by failing to advise them in writing of the specific reasons that it has approved the prepayment of the Osprey Section 515 loan and failing to inform them that they have a right to appeal the approval of a prepayment to the USDA office of National Appeals.

D. Declare that RD has an obligation to follow ELIHPA, RD regulations and Handbooks in processing owners' Prepayment request.

E. Declare that regulations authorizing Federal Defendants to release owners from their obligation to comply with the Restrictive Use Covenant imposed on their prepaid development when financial assistance to residents is terminated for reasons outside the owner's control are contrary to ELIHPA.

F. Declare that RD's failure to publish any regulations or other guidance to control owners' capacity to impose these increased rents and charges on residents is contrary to law.

G. Award Plaintiffs monetary damages against Slate West Eleven LLC.

H. Award Plaintiffs actual and statutory damages pursuant to §§ 83.48 & 559.77, Fla. Stat.

I. Award Plaintiffs damages for the premature loss of their utility allowance.

J.   Award Plaintiff reasonable attorney's fees.

K.   Enjoin Slate West Eleven LLC from retaliatory actions against the Plaintiffs.

Dated: May 30, 2019                          Respectfully Submitted,

                                               /s/ Natalie N. Maxwell
                                             NATALIE N. MAXWELL, Trial Counsel
                                             Fla. Bar No. 16746
                                             ROBERT K. DWYER
                                             Fla. Bar No. 894257
                                             ERIKA RECEK
                                             Fla. Bar No. 57194
                                             Florida Legal Services, Inc.
                                             P.O. Box 533986
                                             Orlando, FL 32853
                                             Phone: 407.801.4709 (direct)
                                             Fax: 407.505.7327
                                             natalie@floridalegal.org
                                             robert@floridalegal.org
                                             erika@floridalegal.org

                                             GIDEON ANDERS
                                             Of-Counsel*
                                             California Bar No. 86872
                                             ERIC DUNN
                                             Virginia State Bar No. 91778
                                             Of-Counsel*
                                             National Housing Law Project
                                             1663 Mission St., Suite 460
                                             San Francisco, CA 94103
                                             Phone: 415.546.7000
                                             Fax: 415.546.7007
                                             ganders@nhlp.org
                                             edunn@nhlp.org

                                             *Applications for admission to the Middle
                                             District of Florida on a *pro hac vice* basis
                                             will be submitted shortly.